*Decisions will be entered under Rule 50.*

ESTATE OF JAMES SMITH, WORCESTER COUNTY TRUST COMPANY AND WILLIAM B. SMITH, EXECUTORS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 105515. Promulgated February 18, 1942.

*James A. Crotty, Esq.*, for the petitioner.
*J. P. Haslam, Esq.*, for the respondent.

OPINION.

STERNHAGEN: 1. The petitioner insists that the fair market value of decedent's shares at the time of his death was limited to the stipulated book value of $15.46 each, because the articles of the corporation required the shareholder, if he wanted to sell shares, to offer them first to the corporation at book value. The Commissioner determined the value, "based upon its [the corporation's] income, balance sheets, and other relevant factors", at $35.

The petitioner's principal contention is that the fair market value of the shares can not be greater than the price at which the corporation could have bought them if decedent had wanted to sell. The shareholder was not required to sell or prohibited from selling. He had the right to retain the shares until death and make a testamentary transfer, and this the decedent did. His successor owner could continue the ownership under the same conditions. Only if a shareholder chose to sell was he required to make an offer to the corporation at book value of the time. The corporation had no absolute right to demand sale—it had no "call"—which fixed the price at which the shareholder could be required to sell. If the corporation wanted his shares before the shareholder wanted to sell at book value, it could dicker with him for a price and book value would not be a determinant of the price. He and the corporation would be the ordinary willing seller and buyer, and fair market value would be the price upon which they would agree, with a presumed knowledge of the facts. The restriction leaves the value unaffected and only restricts the field of available purchasers in the first instance, if the shareholder should wish to sell. It can not be said that such a restriction necessarily affects the fair market value. In *James Couzens*, 11 B. T. A. 1040, 1165, the Board said:

Our problem requires the assumption of a fair and willing seller and a fair and willing buyer under all the circumstances. . The stock provision does not prevent a transaction between such persons and it is the value arrived at in a free and

open transaction between them which must be determined. This can not be check-mated by a statement at the outset that the stock is not readily marketable. We do not construe a fair market as meaning that the whole world must be a potential buyer, but only that there are sufficient available persons able to buy to assure a fair and reasonable price in the light of the circumstances affecting value.

In *Estate of George H. Walker*, 23 B. T. A. 663, 668, the Board said:

The petitioners contend that since the contract of December 31, 1920, restricted the sale of this stock by requiring that it should first be offered to the other stock-holders at its book value without taking into consideration any good will, it had no higher value than that fixed by the contract. The contract provided that any stockholder desiring to sell his stock should first offer it for sale to the other stockholders, but, if after sixty days none of the other stockholders wished to pur-chase it, he could then offer the stock to outsiders. It is apparent, however, that the stock must have had a value in excess of the book value. The company had been in business since 1907, first as a partnership and then as a corporation. It had made substantial earnings and had a good will of a considerable value. Al-though the parties can restrict the sale price of the stock as between themselves they can not, by such a contract, restrict the right of the Government to collect taxes upon the actual value of the stock.

See also *Estate of Richard B. Messer*, 27 B. T. A. 556; *Estate of Frederick A. Koch*, 28 B. T. A. 363.

Cases which hold that restrictions obligating the owner to sell at a fixed price provide a ceiling for valuation are distinguishable. Cf. *Helvering* v. *Salvage*, 297 U. S. 106; *Commissioner* v. *Bensel*, 100 Fed. (2d) 639; *Wilson* v. *Bowers*, 57 Fed. (2d) 682; *Lomb* v. *Sugden*, 82 Fed. (2d) 166.

Since the restrictive provision of the share is held not to affect the value, it is not necessary to consider whether the restriction had prac-tical force to constrain the decedent in view of the large proportion of shares which he and his son owned, giving them the power to cause the repeal of the restriction, or a waiver by the directors.

The evidence does not establish that in fact the fair market value of the shares was less than $35, as the Commissioner has determined. It is stipulated that the net earnings of the corporation were as follows:

| | |
|---|---|
| 1933 | $173, 550. 50 |
| 1934 | 46, 484. 26 |
| 1935 | 222, 726. 77 |
| 1936 | 131, 753. 25 |
| 1937 | 87, 833. 65 |

The total for the five years is $662,348.43, and the straight average is $132,469.69. The evidence does not give life to these figures and the wide variations are not explained. By themselves they provide an inadequate foundation upon which to form a judgment as to actual value of the shares. The stipulation contains the statement, "if the Board should find that notwithstanding the restriction on the sale and transfer of the Southwell Wool Combing Company Stock the

value should be computed upon the basis of average net income of the past five years, such value would be as follows:

```
10 times average earnings  $35.00 per share
 9 times average earnings   34.06  "      "
 8 times average earnings   30.00  "      "
 7 times average earnings   26.49  "      "
 6 times average earnings   22.71  "      "
 5 times average earnings   18.92  "      "
```

It is not agreed that the value of this stock should be computed on this basis."

The Board is in no position to "find that the value should be computed on the basis of average net income", for the question of fair market value is ever one of fact and not of formula. Net earnings are important but they are only one of the many factors upon which value of shares may be considered, and the significance to be given to such figures depends upon the evidence of all the circumstances in which they are found. Cf. *James Couzens, supra*, (at 1170). Without knowledge of the setting in which the earnings appear, they lack substantial evidentiary force from which a useful inference of fair market value can be drawn. Furthermore, it would be entirely unwarranted for the Board, without evidence supporting it, to select a multiple of average earnings as the basis for a finding of fair market value.

Other than these stipulated figures, the evidence consists of the opinions of two witnesses largely based upon a supposed analogy of shares of New England textile corporations. The Southwell corporation was not a textile corporation and these opinions do not lead to a conclusion as to the fair market value of the Southwell shares on the date of death. The evidence does not contain data upon which a finding can be made that the fair market value of the shares was less than the $35 a share which the Commissioner has determined. That value must be adopted, not because of the stipulated formula of ten times average earnings, but because there is no adequate evidence proving it to be incorrect or another figure to be correct.[1]

2. The respondent concedes that the income of the period between the date of death and the selected valuation date was improperly included by him in the gross estate and that it should be eliminated.

3. The respondent reduced the deduction for bequests to charity to $182,951.02, and now, by affirmative answer, pleads error in allowing any such deduction, on the ground that the amount thereof is too uncertain for computation.

The only uncertainty in the bequest to the charities of the various securities other than the Southwell shares rested in the power of the son to direct the trustee to change investments and in the normal

---

[1] See Bonbright, Valuation of Property, chs. XI, XII, XXI, XXIX; Paul, Federal Estate and Gift Taxation, ch. 18.

fluctuations in such investments during the lives of the son and his wife. Both these uncertainties are commonplace circumstances in a bequest to charity after intervening lives, and the value of such bequests is readily determinable by the application of actuarial data of the probable period before ultimate distribution to the charity, *Ithaca Trust Co.* v. *United States*, 279 U. S. 153; Regulations 80, art. 44.[2]

Of the 12,760 shares of the Southwell corporation, one-third, or 4,253⅓ shares, was bequeathed conditionally to Southwell if he should buy the other two-thirds, and the petitioner does not contend that this one-third is within the charitable deduction. The uncertainty is only applicable to the one-third. There is no uncertainty as to the two-thirds; they must, after the second life expires, be converted into cash and distributed to the charities. Since the restriction upon the sale of the shares did not affect the fair market value at the time of death, such fair market value of $35 a share is no less the factor upon which to base the deduction of such shares as were bequeathed to charity than it is a factor of the value of the gross estate. The fair market value of the 8,506⅔ Southwell shares at the date of death must be added to the uncontested fair market value of the various other securities to determine the total basis to which to apply the actuarial factor for calculating the value of the future expectancy of the charities.

The decisions upon which the respondent relies for the proposition that uncertainty precludes a charitable deduction involve uncertainties other than the mere possibility of fluctuation in value before the charity is to receive. In *Gammons* v. *Hassett*, 121 Fed. (2d) 229; certiorari denied, 314 U. S. 673, the charity could only expect to receive such property as would be left after the decedent's widow during her life had without constraint exercised her "desire." The court held that this untrammeled power of the widow over the property made it uncertain whether any property whatever would ultimately be distributed to the charity. Nothing, however, in the present bequest to charity discloses an uncertainty except the possibility that the securities could not survive the possibility of the exercise by the son of his reasonable discretion in changing investments. Such a possibility of disappearance of the corpus is too remote to defeat the deduction.

*Decision will be entered under Rule 50.*

---

[2] Paul, *supra*, ch. 12, § 12.24.